**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

JOLENE STROM,

        Plaintiff,

vs.

HOLIDAY COMPANIES, SPENCER
OIL CO., and KEN BLOOM,

        Defendants.

No. C09-4025-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      *1. The parties and principal actors* . . . . . . . . . . . . . . . . . . 3
      *2. Strom's employment with Holiday* . . . . . . . . . . . . . . . 4
      *3. The aftermath of Strom leaving* . . . . . . . . . . . . . . . . . 13
      *4. Strom's reason for leaving work* . . . . . . . . . . . . . . . . 22

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . 24
   *B. Sexually Hostile Work Environment* . . . . . . . . . . . . . . . . . . . 27
      *1. Elements of claim* . . . . . . . . . . . . . . . . . . . . . . . . . 28
      *2. Harassment based on sex* . . . . . . . . . . . . . . . . . . . . . 31
      *3. Actionable harassment* . . . . . . . . . . . . . . . . . . . . . . 34
      *4. Holiday's knowledge and remedial actions* . . . . . . . . . . . 38
      *5. Strom's constructive discharge* . . . . . . . . . . . . . . . . . 39
   *C. Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      *1. Strom's* **prima facie** *case* . . . . . . . . . . . . . . . . . . . 43
         *a. Protected activity* . . . . . . . . . . . . . . . . . . . . . 43
         *b. Causal connection* . . . . . . . . . . . . . . . . . . . . . 44

        **2.**      *Legitimate reason and pretext* . . . . . . . . . . . . . . . . . . . . . 46

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

A former female sales associate of a convenience store alleges that she was subjected to sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Iowa Civil Rights Act, IOWA CODE CH. 216. The defendants—the company and the store manager—have moved for summary judgment on all of the plaintiff's claims. Thus, I must determine which, if any, of the plaintiff's claims should go to a jury.

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On August 5, 2009, plaintiff Jolene Strom filed an amended complaint against her former employer, defendants Holiday Companies and Spencer Oil Co. (collectively "Holiday"), and her former supervisor, Ken Bloom, alleging the following causes of action: (1) claims of sexual harassment, sex discrimination and retaliation in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. *et seq.*; and (2) a pendent state law claim under the Iowa Civil Rights Act ("ICRA") for sexual harassment, sex discrimination and retaliation, IOWA CODE CH. 216.

On January 27, 2011, defendants filed their Motion For Summary Judgment. First, defendants claim that Strom cannot establish a *prima facie* case of hostile work

environment sexual harassment because the alleged harassment was not based on Strom's sex and was not so severe or pervasive as to alter a term, condition, or privilege of employment and/or did not rise to an actionable level. Second, defendants contend Holiday is not vicariously liable for any alleged sexual harassment. Third, defendants assert Strom cannot establish a *prima facie* case of retaliation. On March 9, 2011, Strom resisted defendants' Motion for Summary Judgment, arguing that there are genuine issues of material facts in dispute regarding all of her claims. On March 29, 2011, defendants filed their reply brief in support of their Motion for Summary Judgment.

## *B. Factual Background*

I will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, I will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' Motion for Summary Judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in my legal analysis.

### *1. The parties and principal actors*

The *dramatis personae* of interest in this ruling are plaintiff Jolene Strom, a 56 year old former sales associate of defendants Holiday Companies and Spencer Oil Co.; Holiday, a Minnesota corporation operating over 400 retail convenience stores in ten states, including a store in Denison, Iowa; Spencer, an Iowa corporation which is an affiliated entity of Holiday and the name under which Holiday does business in Iowa; defendant Ken Bloom, Holiday's Denison Store Manager and Strom's supervisor;

Wanda DeConnick, Holiday's Denison Store Assistant Manager; Ariel Peterson, Stacey Bohlin and Jeremy Davis, sales associates at Holiday's Denison store; Chuck Monson, Regional Manager overseeing Holiday's Denison store; Art French, District Manager responsible for Holiday's Denison store; Andrea Fischer, Holiday's Director of Human Resources; and, Deborah Melton, a Holiday Human Resources Generalist who served as the primary human services contact for Holiday's Denison store.

### 2. *Strom's employment with Holiday*

On March 18, 2008, Strom began working as a sales associate at the Holiday store in Denison, Iowa. Strom's job application provides in part:

> I UNDERSTAND THAT THIS EMPLOYMENT APPLICATION AND ANY OTHER COMPANY DOCUMENTS, INCLUDING EMPLOYEE HANDBOOKS, ARE NOT INTENDED TO CREATE AND DO NOT CREATE, AN EMPLOYMENT CONTRACT BETWEEN THE COMPANY AND ME. THE COMPANY AND ITS EMPLOYEES HAVE AN EMPLOYMENT RELATIONSHIP WHICH IS KNOWN AS EMPLOYMENT AT WILL. THIS MEANS AN EMPLOYEE IS NOT REQUIRED TO WORK FOR THE COMPANY FOR ANY SET PERIOD OF TIME. AN EMPLOYEE MAY VOLUNTARILY LEAVE UPON PROPER NOTICE. THE COMPANY IS ALSO NOT REQUIRED TO EMPLOY AN EMPLOYEE FOR ANY SET PERIOD OF TIME. AN EMPLOYEE MAY BE TERMINATED BY THE COMPANY AT ANY TIME.

Strom's Employment Application at 3, Defendants' App. at 296. Strom was told when she was hired that she would average 36 to 40 hours per week. Strom was paid $7.75 per hour. As a sales associate, Strom's job duties included:

- Provide customers with courteous, efficient service in a way that encourages them to come back

- Comply with company policies and procedures

4

- Prevent gasoline theft and inventory losses
- Process all register transactions and handle currency to ensure employee safety and protect company funds
- Receive, verify, and process merchandise and vendor shipments
- Stock and display merchandise and supplies to prevent being out of stock on an item a customer stopped in to purchase
- Clean and maintain interior and exterior Stationstore appearances to attract and retain customers
- Assist training new associates (with an emphasis on excellent customer service) when necessary
- Monitor and maintain all food service areas to company standards that will attract and retain customers while preventing illness
- Assist food service areas to meet customer needs
- Perform as a cooperative team member in all aspects of the Stationstore's operation
- Other duties as requested by authorized personnel

Sales Associate Job Description at 1, Defendants' App. at 318.

Ken Bloom was the store's manager and Strom's supervisor. As Store Manager, Bloom's job duties included, among others, recruiting, hiring, training, and supervising the Denison store associates, assigning work schedules and daily tasks to those associates, and complying with the company's policies and procedures. Strom reported directly to Bloom. Wanda DeConnick was the store's assistant manager. As assistant manager, DeConnick's job duties included, among others:

> Assist Stationstore Manager with store operations including checkout, merchandising, layout, product inventory, bookkeeping, and maintenance. Control cash and merchandise shrinkage. Hire, supervise, and train Stationstore personnel and provide **excellent customer service.**

Assistant Manager Job Description at 1, Defendants' App. at 240. Ariel Peterson and Stacey Bohlin were both employed as sales associates at the store. Other than Bloom, the only other male employee whose tenure overlapped with Strom was Jeremy Davis and he only worked on March 18, and 19, 2008.

Holiday assigns a District Manager and Human Resources Generalist to each of its stores. The District Manager's job duties include, among others, developing and enforcing procedures for the district, supervising employee development, providing "counsel to management and employees on operational and employee relation issues in conjunction with Human Resources." District Manager Job Description at 1, Defendants' App. at 330. On May 1, 2008, Art French became District Manager responsible for Holiday's Denison store. French was based in Nebraska during May, June, and July 2008, and served as District Manager for approximately eleven to thirteen Holiday Stores in Nebraska, Iowa, and South Dakota. French left his business cards at the Denison store with his contact information. Strom never met French and never saw any of his business cards at the store. During the time Strom worked for Holiday, Andrea Fischer was Holiday's Director of Human Resources, and Deborah Melton held the position of Human Resources Generalist. Melton served as the primary human services contact for Holiday's Denison store.

While Strom was employed by Holiday, it had a sexual harassment policy in place. This policy states, in part:

> Prohibited behaviors under this policy include, but are not limited to, the following:
> 1.     Verbal conduct such as derogatory or insulting jokes or comments, verbal abuse, unwanted sexual advances, propositions or invitations, or comments about an individual's body, clothing, or appearance.

2. Visual conduct such as staring, leering, or display of derogatory, insulting, or sexually suggestive objects, drawings, cartoons, photography, gestures, or use of an electronic medium in an offensive way.

3. Physical conducts such as assault, unwanted touching, blocking normal movement, or interfering with work.

4. Threats or demands for sexual favors as an implicit or explicit term or condition of employment or in return for job related advancement or benefit; conduct that creates an intimidating, hostile or offensive working environment.

5. Retaliation against reported harassment or threatening to report harassment.

This policy prohibits inappropriate activity by supervisory and non-supervisory employees, contractors, and vendor representatives.

Holiday Companies Sexual and Unlawful Harassment Policy and Procedure 1, Defendants' App. at 333.

Holiday's sexual harassment policy contains a complaint procedure which identifies several individuals to whom employees may report complaints of sexual harassment. The harassment complaint procedure provides:

Any employee who feels she/he is a victim of unlawful harassment or retaliation or who has observed unlawful harassment or retaliation in the workplace should immediately notify:

**STATIONSTORE EMPLOYEES**

1. District Manager; or Regional Director of Operations; or

7

2.    Andrea L. Fischer
   Human Resources Director; or
   1-800-745-7411 ext. 8032

3.    Robert S. Nye
   Vice President of Human Resources
   1800-745-7411 ext. 8737

An employee who would prefer not to make a complaint directly to one of the above individuals may call 1-888-635-2612 and leave a detailed description of any concern on voice mail. You may contact any one of the above-listed individuals. Each complaint will be handled confidentially to the extent possible.

It is **NOT** sufficient to report a complaint of sexual or other unlawful harassment to any other management person. **A HARASSMENT COMPLAINT MUST BE DIRECTED TO ONE OF THE INDIVIDUALS LISTED ABOVE OR TO THE 888 NUMBER.**

Holiday Companies supervisors and managers are required to report a formal or informal complaint concerning any act of discrimination directly to the Vice President of Human Resources.

Holiday Companies Sexual and Unlawful Harassment Policy and Procedure 1, Defendants' App. at 333.

Each Holiday sales associate undergoes computer-based training ("CBT") which contains training on Holiday's policies and procedures, including Holiday's sexual harassment policy. Strom went through Holiday's CBT on her first day of work, March 18, 2008. However, Strom contends Bloom completed part of the CBT for her and she never saw Holiday's sexual harassment policy during her CBT. Holiday's employment policies and procedures, including its sexual harassment policy, are also contained in the "Welcome to Holiday Handbook," which is provided to each new employee in a new hire

packet. It is also electronically available to employees in each store though cash register computers. Holiday contends that equal employment law posters, including one or more addressing Holiday's sexual harassment policy, were displayed and visible in the Denison store during Strom's employment there. Strom disputes this assertion. She contends Bloom never showed her any sexual harassment poster in the workplace and did not discuss with her any sexual harassment policy during her orientation. Defendants allege each Holiday employee would periodically receive a copy of Holiday's sexual harassment policy with their paystubs. Strom, however, never received a sexual harassment policy with any of her paystubs.

Strom alleges during her first day of work, Bloom commented that he was a virgin and had never been on a date. Strom's response to these comments was, "Nothing. I didn't say anything to him. I didn't know what to say. I remember thinking why do I care, but then him. . .Yeah--well, I thought why would he be telling me this? I mean, this is my first day of work. Why would I need to know that." Strom Dep. at 219, Defendants' App. at 56. Strom did not interpret Bloom's comments to mean he was asking her out or hitting on her.

On her third or fourth day of work, Strom alleges Bloom called out to her, "Hey, Jolene, check this out" and showed her a picture of a penis on his cellular telephone. Strom responded by telling him it was "disgusting" and turned around. Bloom did not show Strom another similarly offensive picture while she worked at Holiday.

In April or May 2008, Strom alleges Bloom thrust his hips in DeConnick's direction simulating sexual intercourse. Strom alleges, later the same day, DeConnick thrust her hips at Bloom again simulating sexual intercourse. Bloom and DeConnick did not touch each other, or make any noises other than laughing. In response, Strom did "[n]othing.

I just turned around because I was standing at the register." Strom Dep. at 228, Defendants' App. at 58.

After the thrusting incident, Strom alleges Bloom and DeConnick simulated anal sex on each other with a Slim Jim beef jerky stick and joked about digitally penetrating each others' anus and how that would make their fingers smell. Strom testified:

> Well, [DeConnick] says to [Bloom] something about, oh, what if that had been my finger or something. And he's like, yeah – or he said that -- I don't recall exactly. And she said – he said then, oh yeah, but that would have been so dirty and stinky. And she's like, yeah, but you would have liked it anyway.

Strom Dep. at 232, Defendants' App. at 59. Strom told Bloom and DeConnick "they were disgusting" but does not recall saying anything else to them about the incident. Neither DeConnick nor Bloom touched her, invited her to participate, or attempted to simulate sex with her during either the Slim Jim or hip thrusting incidents.

Strom alleges the next occurrence of sexual harassment was when Bloom held himself up between the counter by the cash register and the lottery machine, thrust his hips in the air several times and yelled, "I'm so horny, I'm so horny, I can't help it, and laughing." Strom Dep. at 242, Defendants' App. at 62. Strom did not tell Bloom to stop, but responded by telling him he was "disgusting." Strom did not believe Bloom's hip thrusting was an attempt to hit on her.

After Bloom's hip thrusting incident, Strom alleges DeConnick offered to show her nude pictures of Bohlin on a cellular telephone. Strom told DeConnick that she didn't want to see the pictures and DeConnick never showed her any nude pictures. In April 2008, Strom alleges Peterson had hickeys on her neck and was discussing them with police officer Joe Steinkiller and Strom, telling them she had been "riding on top of" her boyfriend. Strom did not say anything to Peterson about the hickeys. Bloom testified that

he had heard second hand that Petersen had hickeys and once saw a hickey on Bohlin. He told Bohlin to keep the hickey out of sight.

Strom claims the next incident of sexual harassment happened at the end of April 2008, when DeConnick disclosed Strom's telephone number to a male customer and her home address to another male customer. The parties dispute whether Strom's name, address, and telephone number were listed in the local telephone book. Strom contends her contact information was not available in the local telephone book and she never told DeConnick it was acceptable to disclose her telephone number or home address to a customer. While Strom did order hamburger from one male customer, the customer delivered the meat to her at the Denison store. Strom did not give this customer her home address and never told DeConnick that she had given this customer her home address. DeConnick, however, contends she told Strom about giving her telephone number out to the customer and Strom was okay with it.

Strom also alleges Bloom and other co-workers told dirty jokes periodically throughout her employment. Bloom admits that sometimes employees would tell dirty jokes but that he never told such jokes himself. In response to the jokes, Strom "can recall looking at them or just, you know, making a motion or shaking my head or something to that effect, but I did not tell them, you know, that's offensive. I assumed they would take that from my actions." Strom Dep. at 267, Defendants' App. at 68. Strom did not pay attention to most of the jokes and cannot recall the content of a single joke. She testified, "I know at the time they were offensive, but I don't—I cannot sit here today and say I can remember anything about them because I don't." Strom Dep. at 267, Defendants' App. at 68. The owner of Cronk's Café commented on the inappropriate behavior. Bloom did not touch Strom or proposition her.

On June 11, 2008, Strom reported to work for her 2:00 p.m. shift after being off for two days. Bloom immediately instructed Strom to stock sandwiches at the store and threatened her with a written reprimand if the sandwiches were not stocked at all times. Strom explained the situation as follows:

> Well, on my last day in there, I had been off two days – on my two days off prior to then. And before I even clocked in on the register, Ken was telling me that the sandwiches from that point on had to be stocked at all times and that I was going to be wrote up if those sandwiches didn't get stocked. And I'm thinking, oh, my gosh, Ken, I've been off for two days. How could I very well come in here and do something for everybody else that's worked.
>
> And Ariel was sitting up on the counter between two registers with her sunglasses on peering down at me though – she had the sunglasses halfway down on her nose and she's looking out from under them – or above them – and while Ken is explaining to me that he's going to write me up if those sandwiches don't stay stocked at all times, Ariel said she was going to go out and take a break.
>
> So she jumped off the counter, went out and took a break. And I mentioned to Ken at the time – well, Ken had brought up just in a phrase somehow to me and a customer that was standing there something about there she goes out again, she's on that cell phone. And I said, yeah, Ken, that's a problem. That's an ongoing thing because we had – Wanda and I had talked about that because Ariel and Stacey were continuously on their cell phones while they were behind their register.
>
> And I said that is an ongoing thing, that cell phone thing does not – it's not stopped yet, Ken. And he was trying to explain to this customer that, yeah, the girls are going to start to get wrote up for the cell phones and this and that.
>
> When Ariel finally did come in from her break, he says to her, Ariel, I need to talk to you. And she come around the corner and he told her another – and it was a dirty joke. And,

> no, I cannot remember what the joke was. I just recall it being another dirty joke.

Strom Dep. at 270-72, Defendants' App. at 69.

After this occurred, Strom alleges she asked Bloom for the telephone number of Holiday's district office. Strom alleges she wanted the telephone number in order to make a sexual harassment complaint, but told Bloom she wanted the number to ask a question about her insurance. Strom testified Bloom would not give her the telephone number but offered to call the corporate office with her insurance question. Bloom then left the store to make the store's daily bank deposit. Upon Bloom's exit, Strom told Peterson she was leaving and walked out of the store. Strom had been at work less than one-hour. Strom never returned to work at the store.

### 3. *The aftermath of Strom leaving*

Peterson told Bloom when he returned to the store that Strom told her she would be back shortly. Bloom tried to call Strom but when he received no answer he drove to Strom's home where he "knocked" on Strom's front door for an extended period of time.[1] Strom was home but did not answer the door. Bloom returned to the store and called DeConnick to fill in for Strom for the remainder of her shift.

At some point in the afternoon of June 11th, Strom called District Manager Art French and left him a voice message and asked him to call her back. Strom obtained Holiday's corporate office telephone number from a "yellow tag with an 800 number on it" in the Denison store. Strom Dep. at 274, Defendants' App. at 70. French attempted to return Strom's call but got a non-working number because he transposed two digits in her telephone number.

---

[1]Strom characterized Bloom's actions as "beat[ing]" on her door. Strom Dep. at 283, Defendants' App. at 72.

DeConnick called Strom during the evening of June 11th and "wanted to know what's up." Strom Dep. at 267, Defendants' App. at 68. Strom replied, "I've had it with Ken's crap." *Id.* Strom was embarrassed, humiliated, and disgusted by the sexual environment at the store. She felt anxious and trapped. DeConnick talked with Bloom later that night about her conversation with Strom.

On the morning of June 12, 2008, Strom called the human resources department to discuss her concerns regarding the Denison store and was connected with Andrea Fischer, the Director of Human Resources. Strom talked with Fischer for an extended period of time. Strom explained that she was upset with how the store was managed. For the first time, Strom also made allegations about sexually inappropriate behavior at the Denison store. Specifically, Strom alleged:

- Ken had showed her a picture of a penis on his cellular telephone.
- The previous Thursday, Bloom pretended to "pump" DeConnick behind the counter.
- Bloom yelled, "I can't help it. I'm so horny, I can't stop," on a daily basis. Customers, including the owner of Cronk's Cafe, saw it.
- The previous Wednesday, Bloom put his hands on the lottery counter, put his feet on the front counter and pumped into the air.
- DeConnick had placed a Slim Jim between her legs, walked up to Bloom from behind in the candy aisle and pumped into his backend. Bloom then said something about DeConnick putting her fingers up his backend and she said her fingers would get dirty or messed up. Strom said this was a daily occurrence.
- Bohlin left her cellular telephone at work and it contained nude pictures of herself. Ken found it and said, "Let's check out Stacey's phone again."
- Police Officer Steinkiller told Strom that co-worker Marilyn Means was sleeping on the night shift.
- Peterson had hickeys all over her neck and talked to Police Officer Steinkiller about it, stating, "That is nothing, you should see his, I was on top."

14

- A male "bar buddy" of DeConnick's pulled up to Strom's house and said, "Hey, what is going on?"  Strom left and went to the store and asked if someone gave her address to him.  No one said anything.
- Another man called Strom at home.  When Strom asked DeConnick how he got her telephone number, DeConnick stated:  "I gave it to him.  It is the only way he would ask you out. . . I hope you're not upset."
- On the day she left, when Peterson came back in the store after being outside on her break, Bloom told her a dirty joke.

Fischer listened to Strom's allegations of work issues and claims of sexually-inappropriate behavior, took notes, and asked questions to determine the scope of her complaints.  Fischer told Strom there was no reason Bloom should have come to her house the day before.  At the end of the call, Fischer asked Strom what she would like done in response to her complaints.  Strom told Fischer she would like the "place cleaned up-people and facility" and people's "behavior changed."  Fischer Notes at 6, Defendants' App. at 414.  Fischer encouraged Strom not to quit.  Fischer ended the conversation on June 12th by stating she would contact District Manager Art French and start an investigation into her allegations.  Fischer told Strom that French would be in contact with her and she gave Strom French's telephone number so she could contact him.

Fischer called French shortly after speaking with Strom to inform him of her allegations.  In their telephone call, French and Fischer made plans for French to visit the Denison store within a few days to investigate Strom's allegations.  Fischer also called Regional Manager Chuck Monson.

While Strom and Fischer were discussing things, the telephones were not working at the Denison store because of storms in the area the night before.  When Strom did not call the store that morning, DeConnick encouraged Bloom to go to Strom's house to talk with her and find out her intentions.  Bloom took DeConnick's advice and drove to Strom's house to see "if she was okay, if there was a problem at work, how we were going

to fix it so she can come back to work." Bloom Dep. at 78-79, Defendants' App. at 166. When Bloom knocked on Strom's door, Strom called Holiday's Human Resources Department again and spoke to Fischer for the second time. Strom told Fischer that Bloom was again knocking on her door. Fischer responded by instructing Strom to hand Bloom the telephone and tell him that Andrea Fischer from Holiday's Human Resources Department would like to speak with him. Fischer spoke with Bloom for ten to fifteen minutes and told him that it was inappropriate for him to be at Strom's home. Bloom immediately left. Strom testified that she saw Bloom "key" her car as he was leaving. Bloom denies damaging Strom's car.

Fischer again called French to explain her latest conversation with Strom and Bloom. French then called Bloom and reiterated what Fischer had told him about going to Strom's home and explained he would be visiting the Denison store the following week and would be conducting an investigation. Fischer called Strom back to make sure she was okay and informed her Bloom had been instructed not to return to her home. Bloom had no further contact with Strom. Fischer promised Strom that French would be in Denison on Monday to begin an investigation and would be in touch with her. French called Strom on the afternoon of June 12th and left her a message that included his telephone number and explaining he would be visiting the Denison store the following Monday and would call her then to arrange a meeting with her. Strom did not call French back and did not make any further telephone calls to anyone at Holiday to discuss her job status.

On June 13, 2008, Holiday Human Resources Generalist Deborah Melton returned to the office after having been off on June 12th. Fischer discussed Strom's allegations with Melton and they determined Melton would conduct telephone interviews with employees in addition to French's investigation.

On Monday, June 16, 2008, French traveled to the Denison store from Nebraska to investigate Strom's allegations. French alleges that he attempted to telephone Strom twice during the week of June 16th but was unable to get a hold of her. Strom contests this assertion and contends she waited around her house the entire day on June 16th but never heard from French that day or anytime that week. During French's visit to the Denison store, he interviewed employees and reviewed security video tapes for several full days, looking for evidence that would corroborate Strom's allegations. French determined the videotapes failed to show incidents of inappropriate sexual conduct. Because Melton was planning to ask questions about sexually-inappropriate conduct during her telephone interviews with employees, French did not specifically ask employees about sexually-inappropriate behavior. French found several problems with the operational management of the Denison store, including that the videotapes were not always accurately kept, and that employees were allowed to break dress code, sit on the counter, and use their cellular telephones while working. During his investigation, French met with Police Officer Steinkiller, whom Strom had told Fischer could corroborate some of her allegations. Steinkiller told French the Denison store was his favorite stopping point and he had never seen anyone sleeping on duty or doing anything inappropriate. French discovered no evidence during his investigation which he believed corroborated Strom's allegations of sexually-inappropriate behavior.

During the week of June 16, 2008 through June 20, 2008, while French was conducting an investigation at the Denison store, Melton began conducting telephone interviews with Denison store employees regarding the sexually-inappropriate conduct alleged by Strom. On June 20, 2008, Melton sent the following e-mail to French, Monson, and Fischer:

I have interviewed all but two employees regarding the allegations at the Dennison [sic] IA store.

Here are the results so far:

1.   No one has seen or heard any inappropriate behavior or actions such as the Slim Jim incident.

2.   No one has seen the Store Manager show any inappropriate photos/pics off of his cell phone.

3.   Store Manager admitted to showing photo of his nephews.

4.   All employees interviewed admit to seeing other employees sitting on counter.

5.   No one has witnessed or heard of any employees sleeping on the job at the store.

6.   One employee (ASM) admitted to seeing an inappropriate photo of another employee (Ariel) on Ariel's cell phone.

7.   Asst Manager admitted to giving a customer Jolene's home phone number however, Asst Manager said that Jolene said it was ok.

8.   Store Manager confirmed that Jolene's home phone number is listed in phone book.

9.   Only one employee admitted to seeing another employee with (a) hickie on their neck.

10.   One employee said not everyone pulls their weight in the store and that the Store Manager is doing everything and that there are employees taking a lot of breaks.

11.   One employee said that they have shared "jokes" on their cell phones.

I have left messages with the two remaining employees that need to be interviewed before closing this investigation.

Melton e-mail at 1, Defendants' App. at 417.

French replied back to Melton's e-mail on June 22, 2008, writing:

Thank you for the update concerning the interviews at [Holiday's Denison store]. This is confirming everything that I gathered through observation, talking to the employees and manager, and witnessed in the security tapes. I have documented all of this and written up Ken (the SM). I have put Ken on a 60 day action plan and have discussed at length the severity and the result of these actions if he does not meet the criteria in the action plan. Please keep me informed when the final two interviews have been completed.

French e-mail at 1, Defendants' App. at 418. Melton followed up with the following e-mail on June 25, 2008:

I have concluded all interviews at [Holiday's Denison store]. No one has come forward with any inappropriate behavior or actions witnessed or admitted to. The only inappropriate actions that were admitted were:

- Frequent cigarette breaks and employees sitting on counter.
- The assistant manager admitted giving out Jolene's home phone number but said Jolene told her it was okay.
- One employee commented that employees are not pulling their weight and the store manager is doing everything.

I would recommend that a corrective action be documented for Wanda Deconnick, ASM, for giving out personal information to a customer. I was told by employees that they have been verbally disciplined for sitting on counters.

I have a copy of the 60 day action plan you sent for the store manager. I will follow up with you to ensure that Ken is being measured and communicated the expectations of his manager role. Please let me know if you need any additional assistance.

Note:
Art, I have not received the unemployment papers for Jolene. Can you follow up to see if they were faxed to me?

> Please let me know if there is any further assistance you need
> from me in this matter. Thanks for your assistance in viewing
> all the video and follow-up notes, it was a great help!

Melton e-mail at 1, Defendants' App. at 419. At some point, Melton telephoned Strom to determine if she was intending to return to work.[2] Strom told Melton she had retained an attorney so she could not talk to her and Melton needed to talk to her attorney. Melton never talked to Strom's attorney.

Strom was employed by Holiday from March 18, 2008, to June 11, 2008, a span of 85 days. During those 85 days, Strom worked a total of 457.10 hours. Strom's time on the job overlapped 52.02 hours with those times Bloom was on duty and 54.72 hours with those times DeConnick was on duty. While Strom worked for Holiday, there were only five days when Strom, Bloom, and DeConnick had overlapping shifts. During these overlapping shifts, Strom, Bloom, and DeConnick were on the clock together 8.25 hours. Strom worked with both Bloom and DeConnick at the same time only once in the months of April and May 2008, on May 11, 2008, when she worked with both Bloom and DeConnick for a total of 55 minutes. However, Bloom and/or DeConnick would often come into the store when they were not working.

After French's investigation and Melton's telephone interviews were complete, Fischer, Melton, and Robert S. Nye, Holiday's Vice President of Human Resources met and conferred with Steven G. Rush, Holiday's legal counsel. Because of the seriousness of Strom's allegations, Holiday decided to send Melton to the Denison store to conduct an additional investigation into Strom's claims of sexually-inappropriate behavior. On July 1, 2008, Melton traveled to the Denison store to begin her in-person investigation. Melton

---

[2]Defendants contend that Melton contacted Strom sometime in June while Strom claims it was not until July 2, 2008.

arrived at the store unannounced and met individually with store employees. She specifically interviewed them regarding Strom's allegations of sexually-inappropriate behavior. Melton also spoke with Eric Skoog, Cronk's Café's owner and a frequent Denison store customer, whom Strom had told Fischer could corroborate some of her allegations. He told Melton he had not witnessed any inappropriate behavior at the store. The only corroborative information Melton received supporting Strom's allegations of inappropriate sexual behavior were: DeConnick admitted to giving out Strom's home telephone number to a friend of hers; Bloom admitted he sometimes did "body dips" at work as a form of exercise where he puts his feet and hands on the counter and essentially does a reverse push-up; Bloom admitted an employee once had a hickey that she covered up with her hair; and Bloom admitted he had heard or seen people tell dirty jokes. Holiday completed its investigation and determined that it was unable to corroborate Strom's allegations of sexually-inappropriate conduct.

On June 19, 2008, French put Bloom on a 60-day performance plan to address operational deficiencies he discovered as a result of his investigation. The following areas, among others, were noted as requiring improvement:

> Dress Codes will be followed; including approved Holiday uniforms, name tags and facial jewelry.
>
> There will be no sitting on the checkout counters at any time.
>
> Smoke breaks will be limited to and approved by the manager; one half hour break for lunch at non peak hours and two 10 minute breaks when business will allow.
>
> Using cellular phones during working (on the clock) times is prohibited except for emergencies.
> . . .

21

> Work lists and cleaning lists will be used daily and followed up
> by the store manager and will be signed off on by the associate
> and store manager.
>                    . . .
> There will be no more than two products out of stock in the
> cooler at any time with documentation with an explanation and
> actions to correcting the problem.

Bloom Action Plan at 1, Defendants' App. at 422.[3]  On July 17, 2008, DeConnick received an Employee Corrective Action Notice in her personnel file for disclosing Strom's telephone number to a customer.

On July 3, 2008, Holiday terminated Strom's employment, treating her departure from work as job abandonment with an effective date of June 19, 2008.  On July 21, 2008, Strom filed a charge of discrimination against Holiday with the Iowa Civil Rights Commission ("ICRC"), alleging she was subjected to a hostile work environment based on her sex and unlawful retaliation.  Strom also alleged she was constructively discharged from her employment.  On September 2, 2008, Holiday filed a response denying Strom's allegations.  On December 31, 2008, at Strom's request, the ICRC issued a right-to-sue-letter to her.

### 4.    *Strom's reason for leaving work*

Strom claims she did not abandon her job with Holiday but left the store on June 11th to contact French and report the ongoing problems at the store, including the sexually hostile work environment at the store.  Defendants counter Strom abandoned her job with Holiday because she was upset that co-workers were not carrying their weight at work.

---

[3]On September 15, 2008, French determined Bloom had not adequately improved his operational deficiencies and demoted him to an assistant manager position at a different location so he could receive more training.  Bloom resigned his position on September 19, 2008.

They point to Strom's work history and note that this would hardly be the first time Strom had abandoned her employment or left a job without providing notice. Since 1993, Strom has had 13 periods of employment. During that time, Strom has abandoned five jobs and quit five other jobs without notice. Specifically, Strom was employed as a correctional officer at the Scotts Bluff County Correctional Department in Gering, Nebraska, from August 17, 1993 until November 19, 1994, when she resigned that position without notice and relocated due to marital problems. After spending a short time in Iowa, Strom returned to work as a correctional officer at the Scotts Bluff County Correctional Department on June 7, 1995. On January 24, 1997, on a day she was scheduled to work, Strom called the correctional department and spoke with correctional officer Mark Swires. Strom told Swires he should tell her supervisor, Lt. Dan Ramirez, "that he could get fucked and stick the job up his ass." Strom Dep. at 102, Defendants' App. at 27. Strom did not return to work and the correctional department accepted her resignation on January 24, 1997.

On December 5, 1998, Strom began employment as a correctional officer at the Crawford County Sheriff's Department in Denison, Iowa. She quit this position without notice on January 25, 2000, although she refused to submit a letter of resignation. Strom quit this position because "I did not receive benefits and was offered a full time position with benefits at Denison Job Corps." Strom's Third Supplemental and Amended Answers to Defendants' First Set of Interrogatories at 5, Defendants' App. at 272.

On January 21, 2001, Strom was hired by Denison Job Corps in Denison, Iowa, as a residential advisor supervising and assisting students in a dormitory setting. Strom resigned this employment on May 18, 2001, due to family circumstances. Strom was next employed as a clerk at a Loaf 'N Jug convenience store in Scottsbluff, Nebraska, from April 10, 2002 until approximately August or September 2002. Strom left this position to

relocate back to Iowa. From July 29, 2003, until October 16, 2003, Strom was employed as a clerk at a Kum & Go convenience store in Denison, Iowa. Kum & Go terminated her employment for three days of unreported absences.

On October 23, 2003, Strom resumed working for Denison Job Corps as a residential advisor. On November 26, 2006, Strom left her shift without notice and did not return. On December 1, 2006, her employment was terminated for job abandonment. On September 13, 2007, Strom began work as a clerk at Sparky's One Stop convenience store in Denison, Iowa. She last worked at the store on March 15, 2008, and quit on March 18, 2008, without giving notice.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U. S. 574, 586-87 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587.

*Torgerson v. City of Rochester*, ___ F.3d ___, ___, 2011 WL 2135636, at *7 (June 1, 2011) (*en banc*).

The Eighth Circuit Court of Appeals recognized in a number of panel decisions that summary judgment is "disfavored" or should be used "sparingly" in employment discrimination cases. *See id.*, at ___, 2011 WL 2135636, at *8 (collecting such cases in an Appendix). The rationales for this "employment discrimination exception" were that "discrimination cases often turn on inferences rather than on direct evidence. . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and that "intent" is generally a central issue in employment discrimination cases. *See, e.g., Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill*

*v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). On the other hand, the Supreme Court recognized that, even in employment discrimination cases, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In its *en banc* decision in *Torgerson*, the Eighth Circuit Court of Appeals expressly rejected the notion that summary judgment in employment discrimination cases is considered under a separate standard, citing *Reeves* and *Celotex*. Instead, the court held as follows:

> Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

*Torgerson*, ___ F.3d at ___, 2011 WL 2135636, at *8.

I will apply these standards to defendants' Motion for Summary Judgment on Strom's claims.

### B. Sexually Hostile Work Environment

Defendants seek summary judgment on Strom's sexually hostile work environment claim. Defendants argue they are entitled to judgment as a matter of law on this claim because Strom cannot establish her *prima facie* case here because Bloom and DeConnick's

alleged actions, if proven to be true, were not so severe or pervasive as to alter a term, condition, or privilege of Strom's employment.[4]

### 1.    Elements of claim

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).  As the Eighth Circuit Court of Appeals has explained, "[D]iscrimination based on sex that creates a hostile or abusive work environment violates Title VII." *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d

---

[4]In considering Strom's discrimination claims, I will not distinguish between her claims under Title VII and comparable sexual discrimination claims under the ICRA.  I have previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." *Soto v. John Morrell & Co.*, 285 F. Supp.2d 1146, 1177-78 (N.D. Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir. 2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)); *see King v. United States*, 553 F.3d 1156, 1160 n.3 (8th Cir. 2009) (noting that "[b]ecause the same analysis applies to age discrimination claims under the ADEA and the ICRA," the court need not discuss plaintiff's claims under ICRA); *Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1095 n.4 (8th Cir. 2007) (same); *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 n.2 (8th Cir. 2000) ("The ICRA is interpreted to mirror federal law, including the ADEA") (citing *Montgomery v. John Deere & Co.*, 169 F.3d 556, 558 n.3 (8th Cir. 1999)).  This is because the Iowa Supreme Court has recognized federal precedent is applicable to discrimination claims under the ICRA.  *See Soto*, 285 F. Supp.2d at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims.  *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between the ADEA and the ICRA becomes critical, my analysis of Strom's Title VII claims applies equally to her ICRA claims.

841, 845 (8th Cir. 2006) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), and *Quick*, 90 F.3d at 1377).

The elements of a claim of hostile environment sexual harassment differ somewhat, depending on whether the alleged harasser is a co-worker or a supervisor. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). To prove such a claim based on harassment by a co-worker, the plaintiff must prove the following: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on sex; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take proper remedial action. *See Wilkie v. Department of Health and Human Servs.*, ---F.3d---, 2011 WL 1563998, at *8 (8th Cir. Apr. 27, 2011); *Cross v. Prairie Meadows Racetrack & Casino, Inc.,* 615 F.3d 977, 981 (8th Cir. 2010); *Sutherland v. Missouri Dept. of Corrections*, 580 F.3d 748, 751 (8th Cir. 2009); *Nitschie*, 446 F.3d at 845; *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004); *McCown v. St. John's Health System*, 349 F.3d 540, 542 (8th Cir. 2003); *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002).

When the harassment is by a supervisor, however, the plaintiff must prove the first four elements listed above, and if she also proves that the harassment resulted in a tangible employment action, then the employer is vicariously liable for the supervisor's harassment. *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (describing the first four elements as the "common" elements for supervisor and co-worker harassment claims); *Cheshewalla*, 415 F.3d at 850. If she does not prove that the supervisor's harassment resulted in a tangible employment action then the employer may

escape vicarious liability by proving the following elements of the *Ellerth/Faragher* affirmative defense: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Gordon*, 469 F.3d at 1195 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)); *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 n.2 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 850-51. The Eighth Circuit Court of Appeals has found that:

> to be considered a supervisor, "the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties."

*Cheshewalla*, 415 F.3d at 850-851 (quoting *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004)).

In this case, Strom complains of harassment from Bloom and DeConnick. Defendants claim DeConnick was not a supervisor because she lacked the authority to terminate Strom. Strom counters DeConnick was a supervisor because she had the ability to hire and to reassign Strom to significantly different duties. Strom further argues the because DeConnick's position required her to fill in for Bloom in his absence she assumed duties that entailed authority to assign Strom different duties and tasks. Because DeConnick had the authority to reassign Strom to significantly different duties, her authority was sufficient to make her a "supervisor." *See Cheshewalla*, 415 F.3d at 850-851; *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004) (quoting *Joens,* 354 F.3d at 940); *see also Williams v. Missouri Depart. of Mental Health*, 407 F.3d 972 (8th Cir. 2005) (applied supervisor framework to a fact pattern involving a

temporary supervisor). Because I find that both Bloom and DeConnick were Strom's supervisors, the supervisor hostile work environment framework will be applied. Under the supervisor framework, the parties agree Strom can satisfy the first and second elements of her *prima facie* case, that she is female and found the conduct unwelcome. I will consider in turn the challenged elements of Strom's claim of sexual harassment by her supervisors.

### 2. *Harassment based on sex*

Defendants argue the alleged harassing conduct was not based on Strom's sex. They point out that both male and female employees took part in the harassing conduct and none of the conduct involved touching Strom or "explicit or even implicit proposals for sexual activity." Defendants' Br. at 16. Strom counters that the numerous circumstances of harassing conduct by Bloom and DeConnick were directed primarily at women and created a work environment charged with sexual bias. Strom argues a reasonable jury could find harassment of her was based on sex. The United States Supreme Court has provided the following test to determine whether discrimination is because of sex: if the employee would be treated "in a manner which but for that person's sex would be different." *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 683 (1983) (quoting *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978)). The Eighth Circuit Court of Appeals has explained that:

> Same-sex harassment claims differ from those between males and females because the latter "typically involve[ ] explicit or implicit proposals of sexual activity," which create a presumption that the underlying conduct was based on sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). However, this presumption is applicable only if there is credible evidence to show that the alleged harasser is sexually attracted to the plaintiff. *Id.*

31

*McCown v. St. John's Health System*,  349 F.3d 540, 543 (8th Cir. 2003).

In this case, one of the alleged harassers, Bloom, is an apparently heterosexual male harassing Strom and the other female employees he supervised.  There is no evidence in the record Bloom ever exposed the only other male employee of the Denison store, whose employment overlapped with Strom's first two days of employment, to the sexually charged conduct he subjected Strom to.  The summary judgment record includes the following allegations about Bloom:  on Strom's first day at work, Bloom told Strom he was a virgin and had never been out on a date; on Strom's third or fourth day of work, Bloom showed her a picture of a penis on his cellular telephone; Bloom often told dirty jokes in Strom's presence; he simulated having anal sex with DeConnick using a Slim Jim beef jerky stick; he thrust his hips at DeConnick, simulating sexual intercourse with her; Bloom thrust his hips in the air while laughing about being "horny"; and he went uninvited to Strom's home on two occasions, once pounding on the door to Strom's house for an extended period of time even though Strom would not answer the door.  Strom very likely would not have been subjected to the alleged harassing conduct from Bloom had she been a male.  In particular, a jury could reasonably find Bloom would not have simulated having anal sex with another male or around other male employees.

The other alleged chief harasser, DeConnick, is a female.  Defendants argue Strom cannot establish that DeConnick's harassing conduct toward her was based on her sex.  In essence, defendants argue that DeConnick was an equal opportunity harasser because she engaged in sexually charged conduct with both male and female coworkers.  However, viewing the record in the light most favorable to Strom, I  find that Strom has generated a genuine issue of material fact on the issue of whether DeConnick's conduct toward her was based on sex.

In *Carter v. Chrysler Corp.,* 173 F.3d 693 (8th Cir. 1999), the Eighth Circuit Court of Appeals recognized that "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus. Harassment alleged to be because of sex need not be explicitly sexual in nature." *Carter,* 173 F.3d at 700-01 (internal citations omitted). In *Beard v. Flying J. Inc.,* 266 F.3d 792 (8th Cir. 2001), the Eighth Circuit Court of Appeals rejected the defendant's argument that the alleged harassment was not "based on sex," because the alleged harasser subjected males to the same kind of conduct that was the basis for the female plaintiff's sexual harassment claim. *See Beard,* 266 F.3d at 798. Specifically, the defendant in *Beard* argued that, because of the harasser's like conduct toward males, "women were not 'exposed to disadvantageous terms or conditions of employment to which [males were] not exposed,'" as required to show that the conduct was "based on sex." *Id.* (quoting *Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000)). However, the Eighth Circuit Court of Appeals concluded that in a case supposedly involving the same conduct toward men and women,

> [a] plaintiff . . . need not show . . . that only women were subjected to harassment, so long as she shows that women were the primary target of such harassment. See *Quick v. Donaldson Co.,* 90 F.3d 1372, 1378 (8th Cir. 1996). Viewing the evidence in the light most favorable to [the plaintiff] a jury could reasonably find that the vast majority of [the harasser's] activities of a harassing nature was directed toward female employees, and could thus conclude that the harassment of [the plaintiff] was based on sex.

*Beard,* 266 F.3d at 798.

Here, Strom has generated a genuine issue of material fact that she was the primary target of DeConnick's "harassment," such that a reasonable jury could conclude DeConnick's conduct was "based on sex." Although DeConnick instigated the Slim Jim

33

incident with Bloom and, on another occasion, thrust her hips at him simulating sexual intercourse with him, both incidents were performed in front of Strom. DeConnick's other actions were directed solely at Strom: she made an unsolicited offered to show Strom a naked photograph of a female coworker; disclosed Strom's telephone number to a male customer and her home address to another male customer. There is no evidence in the record of DeConnick providing a male co-worker's contact information or home address to a female customer. Because of the overall sexual nature of these incidents, a jury could find that they were based on Strom's sex. *See  Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (noting "when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, 'reasonably could view all of the allegedly harassing conduct . . . as the product of sex and gender hostility,' then 'it is for the fact finder to decide whether such an inference should be drawn.'") (quoting *O'Shea v. Yellow Technology Services, Inc.,* 185 F.3d 1093, 1097 (10th Cir. 1999)). I find Strom has generated a genuine issue of material fact that Bloom and DeConnick's alleged behavior toward her was based on her gender, and defendants are not entitled to summary judgment on the ground Strom cannot establish this element as a matter of law.

### 3.    *Actionable harassment*

The other element of the *prima facie* case in dispute here is the fourth one, whether or not the harassment affected a term, condition, or privilege of employment, *i.e.*, whether the harassment is "actionable." Defendants contend that Bloom and DeConnick's treatment of Strom was not sufficient, as a matter of law, to affect a term, condition, or privilege of employment, *see Beard*, 266 F.3d at 797, in that it was not sufficiently "severe or pervasive." The Eighth Circuit Court of Appeals has explained that "[h]arassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or

pervasive to alter the conditions of the victims employment and create an abusive working environment.'" *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998) (quoting *Harris*, 510 U.S. at 21); *see also Nitsche*, 446 F.3d at 845 (quoting *Howard*). "A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gordon*, 469 F.3d at 1194 (quoting *Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000), in turn quoting *Harris*, 510 U.S. at 21)). As the Eighth Circuit Court of Appeals explained in *Nitsche*, with regard to this element of a sexual harassment claim:

> "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir. 1998) (quoting *Harris*, 510 U.S. at 21, 114 S. Ct. 367). [The plaintiff] must clear a high threshold to demonstrate actionable harm, for "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" obtain no remedy. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed.2d 662 (1998) (internal quotation omitted). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787, 118 S. Ct. 2275 (citation omitted). To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant. *LeGrand*, 394 F.3d at 1101 (citation omitted). Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003) (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.

1999)).  Such standards are demanding, for "Title VII does not
prohibit all verbal or physical harassment" and is not "a
general civility code for the American workplace." *Oncale v.*
*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct.
998, 140 L. Ed.2d 201 (1998).   In determining whether a
work environment was sufficiently hostile or abusive, we
examine the totality of the circumstances, including whether
the discriminatory conduct was frequent and severe; whether
it was physically threatening or humiliating, as opposed to
merely an offensive utterance; and whether it unreasonably
interfered with the employee's work performance.  *Harris*,
510 U.S. at 23, 114 S. Ct. 367.

*Nitsche*, 446 F.3d at 845-46.

Here, viewing the evidence in the light most favorable to Strom, as I must, I find
that she has presented sufficient evidence to generate a genuine issue of material fact on
the question of whether she was subjected to severe and pervasive harassment.

Strom's allegations are recited in the previous section and will not be repeated here.
There is little doubt that the conduct that Strom attributes to Bloom and DeConnick—if it
occurred—was "rude and unpleasant," not to mention "decidedly immature," but the
defendants contend it was nothing more, and as such, it is insufficient, standing alone, to
create a hostile work environment.  *See Nitsche*, 446 F.3d at 846 ("rude and unpleasant"
conduct is not enough); *Duncan v. General Motors Corp.*, 300 F.3d 928, 935 (8th Cir.
2003) ("boorish, chauvinistic, and immature" conduct is not enough).  I cannot agree.

Strom argues the alleged harassment by Bloom and DeConnick was pervasive
because it began shortly after she began working at the store and continued, almost daily,
for the duration of her employment.  *See, e.g., Baker v. John Morrell & Co.*, 382 F.3d
816, 828-29 (8th Cir. 2004) (upholding jury verdict for plaintiff where harassment
continued uninterrupted for years); *Beard*, 266 F.3d at 798 (affirming jury verdict where
plaintiff's supervisor subjected her to numerous incidents of sexual harassment over a

three-week period); *Howard,* 149 F.3d at 840 (affirming jury verdict where co-worker's inappropriate conduct was frequent and chronic); *Bales v. Wal-Mart Stores, Inc.,* 143 F.3d 1103, 1109 (8th Cir. 1998) (affirming jury verdict where harassing conduct "began soon after [the plaintiff] started work . . . and continued until shortly before her departure").

It is particularly relevant that the alleged harassment began on Strom's first day of work and continued throughout the duration of her employment, a period of approximately three months. The incidents in question were not rare, isolated, or sporadic, but routine—according to Strom's testimony, such conduct occurred almost daily during her three months of employment with Holiday. *See Nitsche,* 446 F.3d at 846 (considering whether the plaintiff alleges only a few, isolated, or sporadic incidents). While the same conduct might not be considered sufficiently severe or pervasive to support a claim if spread over a longer period of time, in this case, the conduct permeated Strom's entire three-month working relationship at Holiday. Moreover, the harassment was instigated by her two supervisors, increasing the probability that the situation would be an intimidating one. The inferences of interference with Strom's work performance arise largely from perpetration of the alleged harassment by Strom's immediate supervisors. As I noted in *Steck v. Francis*, 365 F. Supp. 2d 951 (N.D. Iowa 2005), "[F]or both the 'objective' and 'subjective' prongs of the 'severity' inquiry, whether the harasser is a co-worker or a supervisor (or successively higher official or manager) is relevant to the determination of whether a hostile work environment is sufficiently severe or pervasive to be actionable." *Steck*, 365 F. Supp. 2d at 971. This is so, I found, because where the harasser is a supervisor, "victims are and are reasonably perceived to be more vulnerable to supervisor harassment, because when the harasser is a supervisor, the harasser may, and often does, find it easier to target and harass the victim." *Id*. at 972-73. What is particularly significant about my prior decision in *Steck* for present purposes is the

suggestion therein that "the victim can more easily recognize and address conduct between co-workers as ordinary teasing, banter, or the rough and tumble of the workplace" than comparable conduct by a supervisor, and may feel more free to complain about conduct that crosses the line. *Id*. at 973. The record here suggests the truth of that observation, as Strom apparently was reluctant to address the objectionable conduct of Bloom or DeConnick, because they were not at the same level in the company hierarchy as she was. Thus, considering the "totality of the circumstances," *Nitsche*, 446 F.3d at 845-46 (whether a hostile environment has been created must be determined in light of the totality of the circumstances); *Baker*, 382 F.3d at 828 (same), including the fact that Bloom and DeConnick were Strom's supervisors, *Steck*, 365 F. Supp. 2d at 972-73, there is evidence from which a reasonable jury could reasonably infer that the environment to which Bloom and DeConnick subjected Strom was both objectively and subjectively hostile, even in the absence of complaints by Strom about that conduct at the time.

### 4. *Holiday's knowledge and remedial actions*

The final element of a prima facie claim of a sexually hostile work environment is that the employer knew or should have known of the harassment and failed to take remedial steps. *See Wilkie*, ---F.3d---, 2011 WL 1563998, at *8; *Cross,* 615 F.3d at 981; *Sutherland*, 580 F.3d at 751; *Nitschie*, 446 F.3d at 845 *Quick,* 90 F.3d at 1378. "'Once an employer becomes aware of sexual harassment, it must promptly take remedial action which is reasonably calculated to end the harassment.'" *Tatum v. Ark. Dep't of Health,* 411 F.3d 955, 959 (8th Cir. 2005) (quoting *Kopp,* 13 F.3d at 269). In a case of harassment by a supervisor, the plaintiff need not show that the employer knew or should have known of the harassment; an employer is vicariously liable for supervisory harassment if the employee has suffered a tangible employment action. *Cheshewalla,* 415 F.3d at 850. In cases of supervisory harassment where there has been no tangible

employment action, the employer may assert the *Ellerth/Farragher* affirmative defense that: (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 807; *Gordon*, 469 F.3d at 1195; *Cheshewalla,* 415 F.3d at 850. As previously mentioned, a supervisor is someone who has the power to take tangible employment actions against the victim, such as hiring, firing, demotion, or reassignment. *Cheshewalla,* 415 F.3d at 850-51. Because I have concluded that both Bloom and DeConnick were Strom's supervisors, the threshold question here is whether Strom suffered a tangible employment action. If so, Strom will have established this element of her claim. If not, Holiday may assert its *Ellerth/Farragher* affirmative defense.

### 5. Strom's constructive discharge

Strom argues she was constructively discharged, and her constructive discharge is a tangible employment action under *Ellerth/Faragher*. The United States Supreme Court has held that constructive discharge is a tangible employment action for purposes of applying *Ellerth/Faragher,* but only when an official act underlies the constructive discharge. *See Pennsylvania State Police v. Suders,* 542 U.S. 129, 140-41 (2004); *see also Whitten v. Fred's Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (noting "only constructive discharges that are precipitated by an official act qualify as tangible employment actions . . ."); *Chapman v. Carmike Cinemas*, 307 F.3d App'x 164, 169 (10th Cir. 2009) (observing that an employer may invoke the *Ellerth/Faragher* affirmative defense when "'an official act does not underlie the constructive discharge'") (quoting *Suders,* 542 U.S. at 148). Thus, if Strom was subject to an official act that led to her constructive discharge, Holiday may not avail itself of the *Ellerth/Faragher* affirmative defense.

Here, Strom has generated a genuine issue of material fact as to whether French's actions during his investigation were tied to an official act. In *Suders,* the Court used the example of a harassing supervisor who gives an employee a dangerous job assignment to retaliate for spurned sexual advances, thus forcing the employee to resign. *Suders,* 542 U.S. at 150 (citing *Reed v. MBNA Marketing Sys., Inc.,* 333 F.3d 27, 33 (1st Cir. 2003)). Under this scenario, the Court explained, the constructive discharge would be the result of an official act, precluding the employer from asserting the affirmative defense. *Id.* Here, French's actions were tied to his official role as a Holiday District Manager, and his actions toward Strom involved a direct exercise of company authority. *See id.* Thus, any alleged constructive discharge that Strom suffered could be sufficient to make Holiday vicariously liable as a matter of law.

To prove a constructive discharge, the plaintiff must prove that her employer rendered the employee's working conditions intolerable, forcing the employee to quit. *See Brenneman v. Famous Dave's*, 507 F.3d 1139, 1144 (8th Cir. 2007); *Tatum*, 411 F.3d at 960; *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.,* 130 F.3d 349, 354 (8th Cir. 1997); *Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568, 574 (8th Cir. 1997). "Behavior that can be characterized as 'merely offensive' is not actionable, but 'a tangible psychological injury' on the part of the employee is not required for the employer's behavior to be illegal." *Delph,* 130 F.3d at 354 (quoting *Harris,* 510 U.S. at 21). If the plaintiff is to succeed on such a claim, the conduct complained of must have been "severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive." *Id.* (quoting *Harris,* 510 U.S. at 21). In addition, the environment must be perceived subjectively by the victim as hostile, or the conduct cannot be said to have "actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* (quoting *Harris,* 510 U.S.

at 21-22) (citing *Kimzey,* 107 F.3d at 573). The Eighth Circuit Court of Appeals has held that "the employer's actions leading to the decision to quit must have been deliberate, and taken with the intention of forcing the employee to quit." *Id.* (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir. 1981)). In the alternative, where conscious intent is absent, the intention element may nevertheless be satisfied by proof demonstrating the employee's "resignation was a reasonably foreseeable consequence" of the hostile atmosphere of the plaintiff's workplace. *Id.* (citing *Hukkanen v. Int'l Union of Operating Eng'rs Local 101,* 3 F.3d 281, 285 (8th Cir. 1993)).

Taking the evidence in the light most favorable to Strom, I conclude Strom has met her burden, under the reasonably foreseeable consequence standard, of generating genuine issues of material fact which preclude the granting of summary judgment on her sexually hostile work environment claim. During her short 85-day period of employment with Holiday, Strom was subjected to Bloom showing her a photograph of a penis, Bloom and DeConnick simulating anal sex with each other with a Slim Jim beef jerky stick and joking about digital anal penetration, Bloom and DeConnick exchanging pelvic thrusts, Bloom making pelvic thrusts in the air while screaming, "I'm so horny," DeConnick offering to show her nude photographs of a co-worker, and a stream of dirty jokes. Although Holiday investigated Strom's complaint about this conduct, Strom has generated genuine issues of material fact as to whether Holiday's investigation was sincere. Accepting Strom's contentions that she was never contacted by French following her complaint to Fischer, that Bloom left her home in anger and keyed her car in the process, and that she was never contacted as part of the investigation or informed about its status, a genuine issue of material fact exists whether Strom's not returning to work at the Holiday store was a reasonably foreseeable consequence of the hostile environment under the circumstances. Strom points to evidence in the summary judgment record that she subjectively perceived

the environment to be abusive. Further, viewing the evidence in the light most favorable to Strom, such evidence could support a factual finding that the environment was also objectively hostile or abusive. The conduct complained of by Strom was pervasive, in that it occurred on almost a daily basis and involved crude jokes made by Bloom, a supervisor. Furthermore, after complaining to Fischer about Bloom's actions, Bloom returned to her house and did not leave until told by Fischer to do so. The fact finder could find Bloom damaged Strom's car in a pique of rage as he was leaving. A reasonable person could find such an environment intolerable, abusive, and hostile. For these reasons, Strom has presented sufficient evidence to generate a genuine issue of material fact about whether she was constructively discharged-an undisputed tangible employment action. Because Strom has generated a genuine issue of material fact about whether she suffered a tangible employment action, I need not examine whether Holiday qualifies for the *Ellerth/Faragher* affirmative defense.

## C. *Retaliation*

Strom claims she was the victim of retaliation for lodging a sexual harassment complaint. Defendants also seek summary judgment on this claim.

In addition to its prohibitions on sexually discriminatory treatment and the creation of a sexually hostile work environment, Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). On the other hand, "'[f]iling a complaint [of discrimination] does not clothe [the plaintiff] with immunity for past and present inadequacies.'" *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (quoting

*Calder v. TCI Cablevision of Mo.*, 298 F.3d 723, 731 (8th Cir. 2002), with internal quotations in *Calder* omitted). When plaintiffs present "no direct evidence of retaliation, [the court will] analyze [the] claim pursuant to the *McDonnell Douglas* burden-shifting analysis." *Thomas v. Corwin*, 483 F.3d 516, 530 (8th Cir. 2007). I will consider Strom's retaliation claim through each step in the burden-shifting analysis.

### 1.   *Strom's* prima facie *case*

To establish a *prima facie* case of retaliation, Strom must demonstrate the following: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Wegner v. City of Ladue*, 500 F.3d 710, 726 (8th cir. 2007); *Wells*, 469 F.3d at 702; *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006); *Cheshewalla*, 415 F.3d at 851. I will consider in more detail the challenged elements of Strom's *prima facie* case, the first and third ones.

### a.   *Protected activity*

To constitute protected activity, as the basis for the first element of a retaliation claim, the plaintiff's complaint must involve conduct that a reasonable person could have found violated Title VII, that is, conduct that could reasonably be found to be sexual discrimination or could reasonably be found to be sexual harassment, *i.e.*, so severe or pervasive as to alter a term or condition of employment. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (*per curiam*); *Curd v. Hank's Discount Fine Furniture, Inc.*, 272 F.3d 1039, 1041 (8th Cir. 2001). There is no doubt that Strom complained to Fischer about Bloom and DeConnick's conduct and there is evidence that she complained that their conduct constituted sexual harassment. Thus, there is no question that Strom engaged in a protected activity by reporting Bloom and DeConnick's actions. *See Singletary v. Missouri Dep't of Corrections*, 423 F.3d 886, 892 (8th Cir. 2005).

### b.    *Causal connection*

The Eighth Circuit Court of Appeals has explained the requirements to prove the "causal connection" element, the third element of a prima facie case of retaliation, as follows:

> To prove a causal connection, [the plaintiff] must demonstrate the defendants' "retaliatory motive played a part in the adverse employment action." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 896-97 (8th Cir. 2002) (quotation omitted). Evidence giving rise to an inference of retaliatory motive on the part of the employer is sufficient to establish the requisite causal link. *Id.* at 897. "An inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted).

*Thomas v. Corwin*, 483 F.3d 516, 531 (8th Cir. 2007); *see also Wells*, 469 F.3d at 702 ("'A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive'") (quoting *Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005)). A lack of causal connection can also be "reinforced" by undisputed evidence of customer or co-worker complaints against the plaintiff. *Wells*, 469 F.3d at 702. Similarly, other intervening events between protected activity and adverse action may "erode" any causal connection suggested by temporal proximity between protected activity and adverse action. *Cheshewalla*, 415 F.3d at 852.

Strom argues that she has generated genuine issues of material fact on the "causal connection" element of her *prima facie* case of retaliation, because of the timing between her protected activities and defendants' adverse employment action. Where the only connection between the protected activity and the adverse action is time, and that

connection is only a weak one, that may not be enough to establish the third element of the plaintiff's *prima facie* case of retaliation. *See Thompson*, 463 F.3d 821, 826 (8th Cir. 2006). As the Eighth Circuit Court of Appeals has explained,

> Although we have opined that the "timing of [a] termination can be close enough to establish causation in a prima facie case," *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1037 (8th Cir. 2005), we have repeatedly stated that "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *see also Haas*, 409 F.3d at 1037. Furthermore, "[o]ur recent cases have, in our view, made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002).

*Thompson*, 463 F.3d at 826; *accord Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (noting that Eighth Circuit cases "create a complicated picture" concerning the role of timing in retaliation claims). Here, Strom contends that her constructive discharge followed on the heels of her complaint to Fischer about Bloom and DeConnick's alleged sexual harassment. She points out that after formally complaining about the sexually harassing conduct of her supervisors and coworkers, including what she viewed as intimidating conduct by Bloom coming to her home twice, she was promised that French would be in contact with her and an investigation would be undertaken. According to Strom, French failed to contact her and no one from Holiday ever apprised her of the investigation. Giving Strom the benefit of all reasonable inferences that can be drawn from the record, a retaliatory motive can be inferred from Holiday's failure to contact and apprise Strom about the investigation. Given this record, I conclude Strom has generated a genuine issue of material fact on the causation between

the adverse employment action taken by defendants and Strom's engagement in protected activity.

### 2. *Legitimate reason and pretext*

Having found that Strom has established a *prima facie* case of retaliation, her claim may still fail if defendants produce, and Strom fails to rebut, a legitimate, non-discriminatory reason for the allegedly retaliatory action. *See Thomas*, 483 F.3d at 531 ("But even if [the plaintiff] established a prima facie case, the defendants offered legitimate reasons for terminating [the plaintiff], which [the plaintiff] fails to rebut with evidence of pretext. Summary judgment in the defendants' favor is [therefore] proper on [the plaintiff's] retaliation claim."). Defendants have offered a legitimate, non-retaliatory reason for ending Strom's employment, that she abandoned her job. In support of this assertion, defendants point to Strom's work history of abandoning jobs or quitting them abruptly without notice. They point out Strom has abandoned five prior jobs and left five jobs without notice since 1993. Defendants argue Strom, as was her practice, walked off the job on June 11, 2008, without notice and without any indication of her reason for leaving. They further contend she failed to respond to French's June 12, 2008, telephone call and made no inquiries about returning to work. Strom points out her actions at her previous jobs is not reasonably calculated to lead to admissible evidence because Federal Rule of Evidence 404 would exclude such evidence. I agree. In *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507 (D.C. Cir. 1995), the plaintiff sued her former employer, a law firm, for sex discrimination under Title VII. At trial, the court allowed the defendant to introduce evidence of the plaintiff's performance at another law firm prior to her employment with the defendant. *Id* . at 1508. The defendant had argued that the evidence both impeached the plaintiff's credibility and supported its defense that it fired the plaintiff for legitimate business reasons. *Id.* at 1508-09. The jury returned a verdict

46

for the defendant and the plaintiff appealed, contending that Federal Rule of Evidence 404 barred admission of the prior job performance evidence. *Id.* at 1509. On appeal, the court of appeals found that the trial judge abused his discretion in admitting the evidence of the plaintiff's conduct in her prior employment, explaining that drawing an inference that plaintiff's behavior on a prior job was relevant to establish her behavior on a later job was precisely what Federal Rule of Evidence 404 prohibits:

> Both AMM & S and the district court misapprehend the Federal Rules' treatment of character evidence. Under Federal Rule of Evidence 404, "evidence of a person's character or a trait of [her] character is not admissible for the purpose of proving that [she] acted in conformity therewith on a particular occasion," except in certain defined circumstances none of which is present here. FED. R. EVID. 404(a). Additionally, Rule 404(a) provides specifically that evidence of prior acts cannot be introduced to prove the character of a person in order to show that she acted in conformity therewith. FED. R. EVID. 404(b). When the district court admitted the DL & A evidence relating to Neuren's difficulties with personal relationships at that firm, it noted that the evidence was "relevant with respect to how she performed at another firm . . . [AMM & S is] just showing that this is the same problem that this woman had." Trial Transcript, October 7, 1993, at 98-99, reprinted in Joint Appendix, at 83-84. Thus, the district court admitted the evidence for the purpose specifically prohibited by Rule 404-as evidence that she acted in conformity with her behavior at DL & A while working for AMM & S.
>
> AMM & S argues that the DL & A evidence is nonetheless admissible for the purpose of impeaching Neuren's trial testimony concerning her reasons for leaving that firm. Although a party may generally attack the credibility of any witness, Fed. R. Evid. 607, and evidence of character and conduct of a witness may be offered for the purpose of impeachment under Rule 608, these rules do not provide the

basis for AMM & S's argument nor can they provide a basis for admission of the evidence. Rule 608 restricts the character evidence admissible for impeachment to evidence "refer[ring] only to character for truthfulness or untruthfulness." That Rule obviously does not cover the evidence at issue in the present case referring to Ms. Neuren's alleged traits of tardiness and difficulty in personal relations. Rather, AMM & S's argument relies on Rule 404(b) which provides that evidence, although not admissible to prove character traits of a person in order to "show action in conformity therewith," may nonetheless "be admissible for other purposes." Fed. R. Evid. 404(b). Therefore, AMM & S would assert, the evidence of Neuren's past behavior, though inadmissible to support an inference that she acted in conformity therewith in her later employment, is nonetheless admissible for the relevant purposes of rebutting statements in her prior testimony. While the argument may have theoretical validity, it has no applicability to the facts before us.

*Id.* at 1511. The reasoning found in this case is persuasive. Because this is an employment discrimination case, Strom's character is not in issue, either as an essential element of a claim or defense. *See EEOC v. HBE Corp.* 135 F.3d 543, 553 (8th Cir. 1998) (plaintiff's moral character was not an essential element of his retaliatory discharge claim). And no matter how defendants try to frame their intended use of this evidence, they are seeking to introduce inadmissible propensity evidence. Because none of the exceptions found in Rule 404(b) apply here, such evidence is inadmissible to prove Strom abandoned her job at Holiday. I do see one possibility for the admissibility of such evidence. A plaintiff's past work history may be relevant to calculating back pay when it suggests that the plaintiff might not have maintained her employment. *Cf. Gotthardt v. National R.R. Passenger Corp.*, 191 F.3d 1148, 1157 (9th Cir. 1999) ("A plaintiff's past work history may be relevant to calculating a front pay award when it suggests that the plaintiff might not have been employed steadily in the future.").

In turn, Strom has generated genuine issues of material fact rebutting this reason, namely she did not abandon her job but, instead, waited patiently to hear from French about the investigation. She was leery about returning to the store after Bloom's actions at her home. She contends she was never contacted by anyone from Holiday for over three weeks, never informed about the results of the investigation, and never told to return to work after the investigation was completed. When she was finally contacted, she informed Holiday that she had retained counsel. Holiday, however, never contacted Strom's counsel. As previously discussed, Strom has generated genuine issues of material fact that she was constructively discharged from her job by defendants' actions. I am satisfied Strom's evidence generates a jury question as to whether a reasonable person would find the working conditions at issue so intolerable that she was compelled to remain away from work while awaiting the results of the investigation. Summary judgment on Strom's retaliation claim is not appropriate and defendants' Motion for Summary Judgment is denied as to that claim.

## III. CONCLUSION

Giving Strom the benefit of all reasonable inferences that can be drawn from the record, and recognizing that a court must not weigh the evidence, but may only determine whether there are genuine issues for trial, *see Bunda*, 369 F. Supp. 2d at 1046 (the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial), I conclude that Strom has generated genuine issues of material fact on both her sexual harassment and retaliation claims. Therefore. defendants' Motion For Summary Judgment is **denied**.

**IT IS SO ORDERED.**

**DATED** this 6th day of June, 2011.

_Mark W. Bennett_
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA